[Nos. E041493, E042092. Fourth Dist., Div. Two. Feb. 21, 2008.]

CITIZENS FOR RESPONSIBLE AND OPEN GOVERNMENT, Plaintiff and Respondent, v.
CITY OF GRAND TERRACE, Defendant and Respondent;
CORPORATION FOR BETTER HOUSING, Real Party in Interest and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part 5.

1326

**COUNSEL**

Gresham Savage Nolan & Tilden, John C. Nolan and Jennifer M. Guenther for Real Party in Interest and Appellant.

Johnson & Sedlack, Raymond W. Johnson, Abigail A. Broedling and Veera K. Tyagi for Plaintiff and Respondent.

**OPINION**

**GAUT, J.**—Real party in interest, Corporation for Better Housing (Better Housing), appeals from the granting of a petition for writ of mandate in favor of Citizens for Responsible and Open Government (Citizens) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] In its petition, Citizens requested the trial court to overturn the

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

decision of the Grand Terrace City Council approving Better Housing's project (Project) with a mitigated negative declaration and requiring Better Housing to prepare an environmental impact report (EIR). The Project, located on Grand Terrace Road, consists of a 120-unit senior housing facility; a one-story, approximately 6,500-square-foot community senior center; and a four-acre public park.

Better Housing contends Citizens failed to present substantial evidence of a fair argument that the Project's increase in population density, building height, and noise from air conditioners would present significant environmental impacts. Better Housing complains that the mitigation measures were not taken into account in evaluating the Project. We reject Better Housing's contentions and affirm the judgment.

In a second appeal in this case (case No. E042092), consolidated with Better Housing's appeal challenging Citizens's writ petition (case No. E041493), Better Housing contends that Citizens failed to establish entitlement to attorney fees under Code of Civil Procedure section 1021.5. We conclude to the contrary that Citizens is entitled to recover attorney fees from Better Housing and affirm the attorney fees award.

## 1. Factual Background

In 2004, the owner of a vacant parcel of land, adjacent to a senior center on Grand Terrace Road, in the City of Grand Terrace (City), died. The decedent's heirs sold the vacant parcel to the City. The vacant property was zoned for single-family residential development. At one time, a portion of the property had been contemplated for use as a public park. In 2003, the park property was approved as part of the 2003 Petta Park master plan after an environmental assessment hearing by the City Planning Commission. The parkland, however, remained undeveloped open space.

The City purchased the decedent's property with the intent of building a senior housing project next to the existing senior center. The Project property consists of two parcels totaling six acres and zoned as single-family residential.

Immediately to the north of the Project property is vacant property owned by the City. Southern California Edison has an easement on the property for an electrical substation with metal high-voltage electrical transmission towers. To the north, beyond the vacant land is low-density residential property. To the east, abutting the Project property, is a single-story elementary school, Terrace View Elementary School. To the south and west of the Project site are

single-family residential homes, which are predominantly one-story residences. The surrounding residential community is zoned as low-density residential and consists primarily of single-family residences to the south and west, with a school to the east. Further to the west, beyond the single-family residences, is a two-story apartment building, Highland Apartments.

The City negotiated with Better Housing, a nonprofit development corporation, for the development of the Project site. The Project was to include affordable senior housing and would expand the existing 5,000-square-foot senior center to approximately 6,500 square feet. To cut costs, Better Housing initially submitted a development plan to construct a three-story, 120-unit senior housing facility, named the Blue Mountain Senior Villas. The Project plan proposed developing the six acres of land as a single parcel and included senior housing, a significantly larger senior center, and a four-acre public park that was designed to incorporate many of the features of the original park approved in 2003.

In June 2005, Better Housing applied for approval of a specific plan for the Project (Specific Plan), a plot plan and architectural review, and an environmental assessment as to the residential building. The Project application also requested a general plan amendment redesignating 2.05 acres[2] of the property from low-density residential to a newly created medium-high-density residential zone. The 120 residential units, plus parking, were to be constructed on this portion of the property. The medium-high-density residential zone would increase the allowable density from five units per acre to 20 units per acre. The existing maximum density permitted anywhere within the City was 12 units per acre.

According to the initial Specific Plan, the senior housing Project was located on the easterly portion of the Project site, abutting the elementary school. The 120 units were in a single 41,150-square-foot building. The proposed building was three stories.

The City prepared an initial study for the Project (Initial Study) to address any potential adverse environmental impacts arising from the Project. The Initial Study is the preliminary analysis conducted by the lead agency, the City community development department, to determine whether it must prepare an EIR instead of a negative declaration. (Cal. Code Regs., tit. 14, § 15365.)[3]

---

[2] This acreage included the senior center.

[3] Pursuant to section 21083, regulatory guidelines regarding the application of CEQA have been promulgated at California Code of Regulations, title 14, section 15000 et seq. (hereinafter Guidelines). "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents*

The City lead agency staff director, Gary Koontz, concluded that, although the Project could have significant environmental impacts, there would not be any with mitigation measures in place, particularly as to noise, aesthetics, population density, and traffic. Koontz recommended approval of the Project through a mitigated negative declaration.

On August 4, 2005, the City Planning Commission held a public hearing. Residents objected to the Project particularly because the proposed residential building was three stories. The planning commission approved the Project.

The same objections were raised at the hearing before the city council on August 11, 2005. The city council continued the public hearing to September 8, 2005, to allow Better Housing an opportunity to address the issues raised at the hearing and modify its proposal. Issues of concern to be considered at the subsequent hearing included (1) reducing the units on the south end of the residential building to two stories; (2) fencing issues along the south side of the property; (3) landscaping along the south side of the property; (4) air conditioner condenser noise; (5) trash cans; and (6) lighting at the park.

The city council also requested Better Housing to hold an informational public meeting to discuss with the local residents these issues and possible design alternatives. At the subsequent community meeting, Better Housing representatives presented their modified proposal, in which the three-story building was changed to a mixed two- and three-story building.

After holding the informational meeting on August 25, 2005, Better Housing modified its proposed plan by changing the southern wing of the residential building to two stories. The rest of the building was to remain three stories. The roof of the three-story east wing was nearly the same height as that of the adjacent one-story school because the one-story school was elevated on a hill.

At the city council public hearing on September 8, 2005, local residents again raised concerns regarding the Project. Nevertheless, the city council approved the modified Project. On September 22, 2005, the City passed an ordinance approving the Project Specific Plan, mitigated negative declaration, and environmental assessment.

## 2. Procedural Background

After City approval of the Project, Citizens was formed as an unincorporated association to challenge approval of the Project. On October 26, 2005,

*of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278]; see also *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 254, fn. 2 [42 Cal.Rptr.3d 537].)

Citizens filed a petition for writ of mandate with the trial court, challenging approval of the Project's Specific Plan, mitigated negative declaration, general plan amendment, change in zoning, and site and architectural review. The petition contains six causes of action alleging the City failed to comply with CEQA.

After a brief hearing on the petition on June 27, 2006, the trial court granted Citizens' petition, and ordered the City's approval of the Project vacated and remanded the matter to the City for preparation of an EIR. The trial court stated in its written judgment granting writ of mandate, entered on August 10, 2006, that it granted Citizens' writ petition because the Project did not comply with CEQA for the following reasons:

"b. There is substantial evidence that the Project would increase population density. The Specific Plan provides such evidence. A fair argument exists that an increased population density will have environmental effects. Also, this Project is inconsistent with its surroundings, which is a purely residential neighborhood with no taller structures. Thus, a fair argument exists that the taller structures from the Project will adversely affect the environment.

"c. Substantial evidence based on a fair argument was presented at a public hearing that noise from the air conditioners from the Project would be excessive. A fair argument exists that the noise from the air conditioners will adversely affect the environment."

In accordance with the judgment, a peremptory writ of mandate was issued on September 5, 2006, requiring Project approval to be set aside and preparation of an EIR addressing the potential impacts stated in the judgment. During a subsequent hearing, the trial court awarded Citizens $30,000 in attorney fees as the prevailing party under Code of Civil Procedure section 1021.5.

### 3. CEQA Compliance

Better Housing claims the City's approval of the Project did not violate CEQA. Better Housing argues there was not substantial evidence supporting a fair argument that the Project would have a significant impact on the environment.

A. *Standard of Review*

In reviewing an agency's decision for CEQA compliance, an appellate court applies the same standard applied by the trial court, whose findings are not binding on appeal. (*Save Our Peninsula Committee v. Monterey County*

*Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116 [104 Cal.Rptr.2d 326].) We independently review the administrative record to determine whether the agency prejudicially abused its discretion. (§ 21168.5; see also *Save Our Peninsula Committee*, at p. 117; *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 [100 Cal.Rptr.2d 301].) An agency abuses its discretion if it fails to proceed in a manner as required by law or if substantial evidence in the record does not support the agency's decision. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* at p. 117; *Federation of Hillside & Canyon Associations v. City of Los Angeles, supra,* at p. 1259.)

## B. *CEQA Law*

CEQA provides that generally the governmental agency must prepare an EIR on any project that may have a significant impact on the environment. (§§ 21080, subd. (d), 21100, subd. (a), 21151, subd. (a); *Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 570–571 [80 Cal.Rptr.2d 294], quoting *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1601–1602 [35 Cal.Rptr.2d 470].) Whenever there is substantial evidence supporting a fair argument that a proposed project may have a significant effect on the environment, an EIR normally is required. (§ 21080, subd. (c)(1); Guidelines, § 15070, subd. (a); *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1399 [43 Cal.Rptr.2d 170]; *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927 [21 Cal.Rptr.3d 791] (*Pocket Protectors*).) "The fair argument standard is a 'low threshold' test for requiring the preparation of an EIR. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review.*" (*Pocket Protectors, supra,* at p. 928.) If there is no substantial evidence of any significant environmental effect, the agency may adopt a negative declaration. (§ 21080, subd. (c)(2); Guidelines, § 15070, subd. (b); *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390 [83 Cal.Rptr.2d 836].)

Alternatively, if there is no substantial evidence of any net significant environmental effect in light of revisions in the project that would mitigate any potentially significant effects, the agency may adopt a mitigated negative declaration. (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1119 [19 Cal.Rptr.3d 469].) A mitigated negative declaration is one in which "(1) the proposed conditions 'avoid the effects or mitigate the effects to a point where *clearly* no significant effect on the environment would occur, *and* (2) there is *no substantial evidence* in light of the whole record before the public agency that the project, as revised, may

have a significant effect on the environment.' (§ 21064.5, italics added.)" (*Architectural Heritage Assn. v. County of Monterey, supra,* at p. 1119; see also *Citizens' Com. to Save Our Village v. City of Claremont* (1995) 37 Cal.App.4th 1157, 1167 [44 Cal.Rptr.2d 288].)

In reviewing an agency's decision to adopt a mitigated negative declaration, a trial court applies the "fair argument" test. (*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1399; see also *Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at p. 571.)

In challenging the agency's decision to adopt a mitigated negative declaration, the party opposing the Project, Citizens, bears the burden to present substantial evidence of a fair argument that the mitigation measures are inadequate to avoid the potentially significant effects. (*Citizens for Responsible Development v. City of West Hollywood* (1995) 39 Cal.App.4th 490, 498–499 [45 Cal.Rptr.2d 917]; *Citizens' Com. to Save Our Village v. City of Claremont, supra,* 37 Cal.App.4th at p. 1167.) "Substantial evidence includes facts, reasonable assumptions based on fact, and expert opinion supported by facts. [Citation.] Substantial evidence does not include speculation, unsubstantiated opinion, or evidence that is clearly erroneous. [Citation.]" (*Citizens for Responsible Development v. City of West Hollywood, supra,* at p. 499, fn. 2, citing § 21080, subd. (e).) If such evidence exists, the reviewing court must set aside the agency's decision to adopt a negative declaration or a mitigated negative declaration as an abuse of discretion in failing to proceed in a manner as required by law. (*Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at p. 571.)

In reviewing the trial court's judgment on a petition for writ of mandate, we apply the same test. (*Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at p. 571; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1375.) We independently review the administrative record to determine whether the agency failed to proceed in a manner consistent with the requirements of CEQA. (*Pala Band of Mission Indians v. County of San Diego, supra,* at pp. 571–572; *Gentry v. City of Murrieta, supra,* at pp. 1375–1376.)

### 4. Significant Impacts on the Environment

Better Housing contends Citizens did not meet its burden of showing substantial evidence supporting a fair argument that the Project's increase in population density, building height, and noise would cause significant environmental impacts. Better Housing also complains that Citizens did not meet its burden of demonstrating by citation to the record that the proposed mitigation measures are inadequate and that the Project as mitigated may have a significant adverse effect on the environment.

Citizens has the burden of proof of establishing " 'by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. [Citations.]' [Citation.]" (*Architectural Heritage Assn. v. County of Monterey, supra,* 122 Cal.App.4th at p. 1112.) The burden is also on Citizens to " 'demonstrate by substantial evidence that the proposed mitigation measures are inadequate and that the project as revised and/or mitigated may have a significant adverse effect on the environment.' " (*Ibid.*)

Section 15358 of the Guidelines states, " 'Effects' and 'impacts' as used in these guidelines are synonymous.

"(a) Effects include:

"(1) Direct or primary effects which are caused by the project and occur at the same time and place.

"(2) Indirect or secondary effects which are caused by the project and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect or secondary effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on air and water and other natural systems, including ecosystems.

"(b) Effects analyzed under CEQA must be related to a physical change."

Guidelines section 15064, subdivision (d) states, "In evaluating the significance of the environmental effect of a project, the lead agency shall consider direct physical changes in the environment which may be caused by the project and reasonably foreseeable indirect physical changes in the environment which may be caused by the project."

Section 21068 defines a " '[s]ignificant effect on the environment' " as "a substantial, or potentially substantial, adverse change in the environment." Guidelines section 15382 further defines a "significant effect" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance."

A. *Increase in Population Density*

Better Housing argues there is no evidence to support a fair argument that the Project's increase in population density would have a significant environmental impact. According to Better Housing, the proposed average density for

the Project is actually 20 units per acre rather than 60 units per acre because the Project encompasses six acres of land. Better Housing complains that Citizens failed to identify or provide evidence of any significant impact that might result from the increased density. Better Housing notes that prior to submission of the Project for approval, the City had already approved of a senior center and affordable senior housing on the Project site. In addition, the City's updated general plan housing element stated the site qualified for medium-high-density senior housing.

Citizens argues, and the trial court found, that the proposed residential facility density is 60 units per acre, far in excess of the general plan density limit of 12 units per acre for any building in the City, as well as in excess of the general plan amendment allowing for 20 units per acre.

There is no question the Project will increase the population density. The issue is whether there is a fair argument the increase will cause a significant impact. Better Housing attempts to minimize the density impact by calculating the density based on not only the land to be used for the residential facility, but also the adjacent parkland. By doing so, the population density is 20 units per acre, as opposed to 60 units per acre. This is possible because the City owns both parcels of land.

We find this a disingenuous method of evaluating the Project density, particularly when the four-acre parcel was already approved as a public park in 2003, before submission of the instant Project. In addition, the Specific Plan identifies the park as separate from the senior housing and senior center. The plan states that the multiple-family senior development "will consist of 120 senior-oriented villas, and related parking area on 2.05 acres"; 1.90 acres were designated as residential housing, zoned for a maximum density of 20 units per acre.

Despite the presence of the adjacent park, the residential facility density, in reality, is 60 units per acre. This is far in excess of the population density in the surrounding neighborhood, which consists primarily of single-family residences, mostly single-story homes, along with a single-story elementary school and vacant land to the north of the Project. The surrounding neighborhood is zoned for a maximum density of five units per acre. At the hearings on the Project, the public repeatedly objected to the massive, high-density nature of the housing facility.

When Councilmember Hilkey asked the city manager during a public hearing how many properties were included in the Project, the city manger stated there were two. Hilkey responded, "So we are putting 120 units on two acres." The city manager acknowledged at the planning commission hearing

that the Project was being built in a residential zone and noted that "If this were a market rate apartment complex, being utilized for anybody, and not for a senior project, we wouldn't be having this discussion because I wouldn't support a project . . . in this particular location."

Until the amendment to the general plan arising from the instant Project, the maximum density for any building in the City was 12 units per acre. The general plan amendment, approved in conjunction with the Project, increased the maximum density to 20 units per acre for the Project. This created a new high-density residential zone for the senior housing Project. The Project density, however, is not even in compliance with the new density limits.

Better Housing claims that it is more advantageous to consolidate the 120 units in the proposed two- and three-story building than to spread the units out over the six-acre parcel. Otherwise, not only would the public lose the park, but the Project would become more costly and less economical for seniors. But if the park were eliminated, the Project might not be approved at all because of elimination of the four-acre open space, which was already approved as a park in 2003 and was consistent with the open-space element of the general plan. As Better Housing notes in its reply brief, the park served as a buffer between the Project and the residences to the south and west.

Better Housing argues that, according to the Initial Study, senior housing projects are commonly located near elementary schools and are considered a compatible land use. The study acknowledged that the Project could result in potential impacts but the impacts could be mitigated. Such mitigation measures for the Project included (1) screening, setbacks, and landscaping of the Project along the southern property line adjacent to the single-family homes; (2) provision of alternative transit and access to mass transit routes; (3) directing outside lighting from the Project so as to avoid glare at nearby homes; and (4) compliance with the City's noise ordinance and general plan noise restrictions.

Better Housing acknowledges in its reply brief that "the Initial Study did find that the Project may be incompatible with existing land use, and therefore potentially significant . . . ." However, Better Housing claims mitigation measures imposed on the Project eliminated the concern. We disagree. There is substantial evidence in the record showing that, while these mitigation measures may aid in making the facility more compatible with the surrounding residential neighborhood, there is nevertheless substantial evidence of a fair argument that the proposed high-density residential facility remained "a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) Such changes to the environment included changes to the physical and aesthetic conditions and character of the surrounding low-density, single-family residential neighborhood. (Guidelines, § 15382.)

## B. *Building Height Impact*

Better Housing argues Citizens has not presented substantial evidence that the approved building height presents a significant environmental impact. Better Housing claims there is no evidence that the height of the 120-unit residential building was inconsistent with the neighborhood or that it would cause an environmental impact.

Citizens argued in the lower court and argues on appeal that the residential building "would result in a land use that was inconsistent with the surrounding property, largely because of the size and massing and the destruction of views of the mountains" to the east. In support of this contention, Citizens provided numerous citations to the administrative record. Citizens also noted that residents from the community complained at the public hearings on the Project that the building was three stories, and claimed the building would set a bad precedent for the City since there was only one other three-story building in the entire city, an office building some distance away on Barton Road.[4]

Better Housing argues that Citizens' citations to the administrative record are to matters occurring before Better Housing modified its plan to lower the height of a portion of the building to conform to the surrounding neighborhood. Better Housing also argues that the surrounding neighborhood does not consist entirely of single-family residences. There is a two-story apartment building, Highland Apartments, to the west of the Project site, a school to the east, and a vacant lot to the north, with an easement for Edison high-voltage power lines.

Although the original plan proposed a three-story structure, the plan was modified after residents objected to the proposed three-story building at public hearings on the Project on August 4 and 11, 2005.

The hearing on August 11 was continued to September 8 to allow Better Housing to modify the Project plan. Better Housing thereafter modified the plan by transferring 13 units from the upper floors to the lower floors and to where parking had been proposed. The third story was eliminated from the southern wing of the Project. The east wing, abutting the school, remained three stories. The number of third-story units was reduced from 47 to 23.

Nevertheless, community members continued to object to the Project. At the hearing on September 8, 2005, one individual asked why the new Project

---

[4] Barton Road is approximately one mile south of the Project site, and curves in a northeast direction to the east of the Project.

changes were not made available to the public prior to the meeting and why the modified plan was not resubmitted to the City Planning Commission for review. Another individual supporting the Project, however, noted that Better Housing had presented the modified Project at the community meeting.

Better Housing claims the modified plan is now a mixed two- and three-story structure, consistent with the surrounding neighborhood, which contains numerous two-story single-family houses and apartments. In addition, the Project site is cut into the hillside, with the elevation lowered about 10 feet. Because the school to the east is elevated on a slope, the roofline of the three-story east wing is only about six to eight feet higher than the adjacent school building.

Photographs of the Project area reflect that the surrounding neighborhood consists primarily of one- and two-story single-family residences, as well as vacant land to the north and mountain vistas to the east. There are no three-story buildings nearby and only one existing three-story building in the entire city. Furthermore, the Project structure is larger than other buildings in the area due to its high unit density per acre.

While the original plan was modified to lower the roofline of the south wing of the housing structure and Better Housing claims the three-story east wing is not much higher than the roofline of the adjacent one-story school building, we nevertheless conclude there is substantial evidence of a fair argument that the residential building height would present significant environmental impacts, particularly since it is a relatively large, high-density facility, which is uncharacteristic of the surrounding neighborhood structures, and the easterly wing of the building remains three stories, with 23 units on the third floor.

Better Housing cites *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572 [18 Cal.Rptr.3d 814] (*Bowman*) and *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego, supra,* 139 Cal.App.4th 249 (*Banker's*) for the proposition that "obstruction of a few private views in a project's immediate vicinity is not generally regarded as a significant environmental impact." (*Bowman, supra,* at p. 586; see also *Banker's, supra,* at p. 279.) But there is evidence the environmental impact is not just obstruction of the views of a few adjacent homeowners. The impact creates a change in the aesthetic environment and interferes with scenic views of the public in general by introducing into the primarily single-family, residential neighborhood a large, high-density, residential building, which includes mixed two-story and three-story structures. (*Bowman, supra,* at p. 586.) Aesthetic issues, such as public views, "are properly studied in an

EIR to assess the impacts of a project." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492 [14 Cal.Rptr.3d 308], citing § 21100, subd. (d).)

C. *Air Conditioning Noise*

Better Housing contends Citizens failed to meet its burden of showing substantial evidence that the Project noise from air conditioners, as mitigated, will have a significant environmental impact. Better Housing argues the only evidence of a noise impact is the testimony of an individual who stated that the air conditioners sound like airplanes.

The Initial Study acknowledges that there are sensitive receptors, such as the elementary school and single-family residences adjacent to the senior residential facility. According to the City's general plan noise element, residential uses should be limited to exterior noise levels of 65 dB CNEL (decibel community noise equivalent level).[5] The majority of the Project site falls within the 60 to 65 dB CNEL contour line. The easterly portion of the site, adjacent to the school, is under 60 dB CNEL.

 The Initial Study concludes the air conditioners will cause a noise impact, but with mitigating measures, such as "shielding" the air conditioner units, the Project will operate within City general plan noise standards. We note, however, that "conformity with a general plan does not insulate a project from EIR review where it can be fairly argued that the project will generate significant environmental effects. [Citation.]" (*Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 881–882 [274 Cal.Rptr. 720] (*Oro*).)

At the city council public hearing on August 11, 2005, community and city council members expressed concern that the air conditioners would be noisy. A Better Housing representative stated that the air conditioners would consist of individual wall units, in which the condensers were contained inside each air conditioner unit rather than on the ground. This would diminish noise transmitted to the outside. The Better Housing representative acknowledged the air conditioner units were like hotel units.

A community member who had been in the heating, ventilation and air conditioning (HVAC) business for 30 years stated: "I'm even more terrified tonight to find out that we're using PTACS, Packaged Terminal Air

---

[5] CNEL "represents the average daytime noise level during a 24-hour day, adjusted to account for the lower tolerance of people to noise during evening and nighttime relative to their daytime tolerance." (*Muzzy Ranch Co. v. Solano County Airport Land Use* (2007) 41 Cal.4th 372, 379, fn. 1 [60 Cal.Rptr.3d 247, 160 P.3d 116].)

Conditioning Units. I've been in the HVAC business for 30 years, so I know a little about 'em. And they sound like airplanes. And if I have a, a rack of them behind my house and all of us along there, not only are we losing our view, we are losing our privacy, we're now gonna have to listen to the noise of those air conditioners. And because the utilities are included in the rent, I'm pretty sure those air conditioners are gonna be runnin' 24/7."

Councilmember Hilkey stated he also was concerned about the noise on Brentwood Avenue, south of the Project. Hilkey stated: "I think we have a noise issue. I'm much more concerned about 35 heat pumps going there, 35 air conditioners going, than I am about the view issue."

The city council continued the hearing to allow Better Housing to address the concern regarding the air conditioner noise. At the September 8, 2005, hearing, a Better Housing representative said Better Housing had reduced the number of air conditioner units to 20 units on the south side of the Project closest to Brentwood Avenue. Better Housing also claimed the air conditioners were smaller and less noisy than those used for two-story homes. The Better Housing representative conceded that he did not know what the decibel level was for the units.

Hilkey noted that there had not been any change to the type of air conditioners to be used. The Project architect, John Cotton, stated that Better Housing had selected the particular type of air conditioner designated for the Project, even though it was more noisy than traditional indoor units, because the quieter ones were almost twice as expensive. Cotton noted that the air conditioners were smaller, quieter, and more efficient than older air conditioners.

The Initial Study noise reduction measures were included in the Project conditions of approval, along with additional noise impact mitigation measures and a mitigation monitoring plan. Mitigating measures required in the Project conditions of approval also included a buffer setback to minimize noise impacts on neighboring residences and the school; the senior residential facility was to be at least 60 feet from its nearest neighbor and the property line; trees were to be planted along the street on the south side of the Project as a noise buffer; the air conditioners were to be flush with the exterior wall and have a self-contained condenser that would not transmit noise outside; and the number of air conditioners near neighboring residences was to be reduced to 20.

Citizens argues that the City was unable to determine at the September hearing the noise impacts because Better Housing did not provide a noise rating on the units. There was thus no evidence of the actual noise impact of the air conditioners, either individually or en masse. Furthermore, Citizens argues that this court cannot weigh the evidence.

While this court must defer to the lead agency's weighing of credibility questions involving *disputed* factual questions going to *credibility*, where there is no opposing evidence, there is no credibility determination requiring deference. (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 934.) Deference is not required when there is a weighing of some substantial evidence against other substantial evidence. (*Id.* at p. 935.) Under such circumstances, "neither the lead agency nor a court may 'weigh' conflicting substantial evidence to determine whether an EIR must be prepared in the first instance. Guidelines section 15064, subdivision (f)(1) provides in pertinent part: 'if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect. [Citation.]' " (*Pocket Protectors, supra*, at p. 935.)

Citizens asserts there was evidence that the proposed window-mounted units are noisier than units normally used in two-story homes. There were also public comments at the hearings that the air conditioners are very noisy. Citizens claims this evidence was sufficient to raise a fair argument of significant noise impacts. (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 937.) We agree. Such evidence showing that the air conditioners would cause a significant noise impact included testimony by an individual who had worked in the HVAC business for many years, stating that the type of air conditioners selected tended to be extremely noisy and that numerous such units would subject the neighboring homes to a great deal of noise.

While this testimony was made before Better Housing modified the Project plan, after Better Housing modified the plan there was evidence at the September 8 hearing that the type of units to be used had not changed and were noisy. Better Housing proposed additional mitigating measures to reduce the noise emanating from the units but there still was sufficient evidence in light of the whole record to conclude there was a fair argument that Better Housing's Project would have a significant environmental noise impact. (*Oro, supra*, 225 Cal.App.3d at p. 880.)

In addition to testimony the air conditioners were very noisy, the mitigated Project still included 20 air conditioner units on the southern border of the

Project, near residential single-family homes. The Project architect acknowledged that the units were nosier than traditional units but noted that they were selected because the quieter units were twice as expensive.

Although there was no evidence as to the actual noise rating of the individual air conditioner units or of the actual noise level caused by the units en masse, there was nevertheless a sufficient basis for concluding that, even with the mitigated measures in place, there was enough evidence to support a fair argument that the Project's noise from 20 or more noisy air conditioners would have a significant environmental impact. (*Oro, supra*, 225 Cal.App.3d at p. 885.)

As noted in *Oro* and several other cases, " ' "One of the purposes of the [EIR] is to insure that the relevant environmental data are before the agency and considered by it prior to the decision to commit . . . resources to the project . . . ." ' [Citations.] In short, in the absence of overriding circumstances, the CEQA process demands that mitigation measures timely be set forth, that environmental information be complete and relevant, and that environmental decisions be made in an accountable arena. [Citation.]" (*Oro, supra*, 225 Cal.App.3d at p. 885; see also *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84 [118 Cal.Rptr. 34, 529 P.2d 66]; *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 308–309 [248 Cal.Rptr. 352].) In the instant case, the mitigated negative declaration did not satisfy these principles and could not satisfy them on the existing information base. (*Oro, supra*, at p. 885.)

Also, even though the mitigated negative declaration states that noise levels exceeding the applicable City general plan noise standard maximum of 65 decibels are prohibited, there is no evidence of any measures to be taken that would ensure that the noise standards would be effectively monitored and enforced vigorously. (*Oro, supra*, 225 Cal.App.3d at p. 882.)

Upon reviewing the record as a whole, and taking into consideration the mitigating measures, we conclude there is substantial evidence that it can be fairly argued that the Project may have a significant environmental noise impact.

### 5. Attorney's Fees*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1323.

### 6. <u>Disposition</u>

The judgment is affirmed. Citizens is awarded its costs on appeal.

Hollenhorst, Acting P. J., and McKinster, J., concurred.

On March 19, 2008, the opinion was modified to read as printed above.