Filed 4/9/13  Whispering  Palms Community Council v. County of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| WHISPERING PALMS COMMUNITY COUNCIL, <br><br> Petitioner and Appellant, <br><br> v. <br><br> COUNTY OF SAN DIEGO et al., <br><br> Respondents and Appellants; <br><br> NEWPORT PACIFIC, INC., <br><br> Real Party in Interest and Appellant. | D061599 <br><br><br> (Super. Ct. No. 37-2010-00051307-CU-WM-NC) |

APPEALS from an order of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Affirmed as modified.

The appeal and cross-appeal before us concern an award of attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5) to Whispering Palms Community Council (WPCC).  The trial court awarded attorney fees to WPCC for the successful litigation of its petition for a writ of mandate against the County of San Diego

(the County)[1] to require the preparation of an environmental impact report (EIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) for a real estate development proposed by real party in interest Newport Pacific, Inc. (Newport Pacific).

We conclude that the trial court did not abuse its discretion in determining that an award of fees was warranted, but in making the award the trial court improperly included $5,287.50 incurred by WPCC in retaining a traffic engineering expert. We reject WPCC's contention in its cross-appeal that the trial court abused its discretion in not awarding the full amount of fees that it sought. We therefore modify the trial court's order to subtract $5,287.50 from the fee award, and we affirm the order as modified.

I

FACTUAL AND PROCEDURAL BACKGROUND

As alleged in its petition, WPCC is a nonprofit public benefit corporation, with its membership comprised of the residents of the Whispering Palms resort-type residential community in an unincorporated area of the County, near Rancho Santa Fe. Newport Pacific sought to develop a 4.31 acre lot in Whispering Palms (the Parcel). After abandoning an original plan to develop an assisted living facility on the Parcel, Newport Pacific applied to the County in 2002 for approval of a grading permit to develop a mixed use commercial residential project on the Parcel (the Project). The Project encompassed

---

[1] The County's Department of Public Works was also named in the petition as a respondent. For the purposes of our discussion, we refer to the County and its Department of Public Works, collectively, as "the County."

2

a development of 9,559 square feet of retail space, 19,500 square feet of office space and 54 apartment units.

Several years of administrative proceedings occurred at the County level, in which WPCC participated, about whether an EIR would be required for the Project. The County made a final determination in January 2010 that no EIR was required by issuing a mitigated negative declaration and giving final approval for a grading permit.[2]

WPCC filed a petition for writ of administrative mandamus against the County in February 2010, naming Newport Pacific and Richard Cavanaugh as real parties in interest.[3] The petition alleged that the County violated CEQA by approving the Project without requiring an EIR.

The trial court granted the petition and set aside the County's approval of the mitigated negative declaration. Specifically, the trial court found that there was substantial evidence that a fair argument could be made that the Project would cause a significant unmitigated impact on traffic in the area.

---

[2] "CEQA provides that generally the governmental agency must prepare an EIR on any project that may have a significant impact on the environment. . . . [¶] Alternatively, if there is no substantial evidence of any net significant environmental effect in light of revisions in the project that would mitigate any potentially significant effects, the agency may adopt a mitigated negative declaration. [Citation.] A mitigated negative declaration is one in which '(1) the proposed conditions "avoid the effects or mitigate the effects to a point where *clearly* no significant effect on the environment would occur, *and* (2) there is *no substantial evidence* in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." ([Pub. Resources Code,] § 21064.5, italics added.)'" (*Citizens for Responsible and Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1331-1332, citations omitted.)

[3] Cavanaugh is apparently the president of Newport Pacific.

WPCC filed a motion for an award of attorney fees and expenses pursuant to section 1021.5, arguing that it was the prevailing party in litigation that conferred a significant benefit on a large class of persons. WPCC requested that the attorney fee award be based on a lodestar figure of $227,116.48, which included attorney fees and expenses for significant prelitigation activity during the administrative proceedings, and which was arrived at by using an hourly rate of $425 for the lead attorney, Julie Hamilton. WPCC requested that the trial court apply a multiplier of 1.5 to the lodestar, for a total fee award of $307,181.

The County and Newport Pacific ("Appellants") opposed the motion, arguing that WPCC did not meet the requirements for recovering attorney fees under section 1021.5 because the homeowners comprising the WPCC membership stood to gain financially from the litigation in that they sought to protect their property values. Appellants also challenged the amount of the fee award sought by WPCC.

The trial court found that the requirements for an award of fees under section 1021.5 were met. It awarded WPCC fees, including costs and out-of-pocket expenses, of $141,303.37. The award was based on a hourly rate for Hamilton of $350, rather than $425 as she had sought, and did not reflect a multiplier to the lodestar amount. In arriving at the award, the trial court reduced, by two-thirds, the prelitigation fees incurred during the administrative proceedings to "account for the activities occurring more than 2 to 4 years before the action was even filed," which the trial court found be to "excessive."

Appellants filed a notice of appeal from the fee award. WPCC cross-appealed, challenging the amount of the fee award.

4

II

DISCUSSION

A.     *The Trial Court Properly Awarded Attorney Fees Pursuant to Section 1021.5*

     1.     *Applicable Legal Standards for an Award Under Section 1021.5*

Section 1021.5 provides for an award of attorney fees to a successful party "in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."  The Legislature enacted the provision to codify the private attorney general doctrine previously developed by the courts.  (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 250.)  "'It is well settled that the private attorney general theory applies to an action to enforce provisions of CEQA.'"  (*Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 612.)

Applying the statutory criteria, "'[t]o obtain attorney fees under section 1021.5, the party seeking fees must show that the litigation:  "'"(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) [was necessary and] imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter.'  [Citation.]"  [Citation.]'"  [Citation.]  Because the statute states the criteria in the conjunctive, each must be

5

satisfied to justify a fee award.'" (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 429.)

Here, Appellants focus on just one of the statutory criteria. Specifically, they contend that WPCC did not satisfy its burden to establish that the "financial burden of private enforcement . . . [is] such as to make the award appropriate." (Code Civil Proc., § 1021.5.)[4]

Addressing the financial burden requirement, our Supreme Court has explained that "'[t]his requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.'" (*In re Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215 (*Whitley*).) "[T]he purpose of section 1021.5 is not to compensate with attorney fees *only* those litigants who have altruistic or lofty motives, but rather *all* litigants and attorneys who step forward to engage in public interest litigation *when there are insufficient*

---

4  In their appeal, Appellants do not challenge the trial court's ruling that WPPC established that the litigation resulted in the enforcement of an important right affecting the public interest and that a significant benefit was conferred on the general public or a large class of persons. (See *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 754 [important public rights are at stake in litigation to enforce CEQA and compliance with planning and zoning laws].) Further, to the extent that the statute requires a separate showing that a private action was *necessary*, Appellants do not dispute that issue. (See *Wilson v. San Luis Obispo County Democratic Central Com.* (2011) 192 Cal.App.4th 918, 926 [the "'necessity and financial burden requirement "'really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys,'"' and "the necessity of private enforcement . . . 'has long been understood to mean simply that public enforcement is not available, or not sufficiently available'"].) Indeed, "'"[w]here suit is brought against governmental agencies and officials [as here], the necessity of private enforcement is obvious."'" (*Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 512.)

*financial incentives to justify the litigation in economic terms.*" (*Id.* at p. 1211, italics added.) "[A] strong nonfinancial motivation does not change or alleviate the 'financial burden' that a litigant bears. Only offsetting pecuniary gains can do that." (*Id.* at p. 1217.)

2. *Standard of Review*

"We review an attorney fee award under section 1021.5 generally for abuse of discretion. Whether the statutory requirements have been satisfied so as to justify a fee award is a question committed to the discretion of the trial court, unless the question turns on statutory construction, which we review de novo." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 152-153.)

Appellants contend that a de novo standard of review applies. They claim that this case is like *Whitley*, in which our Supreme Court applied a de novo standard of review in determining "whether a litigant's nonpecuniary interests can disqualify him or her from eligibility for attorney fees under section 1021.5" (*Whitley*, *supra*, 50 Cal.4th at p. 1214), or like *Edna Valley Watch v. County of San Luis Obispo* (2011) 197 Cal.App.4th 1312, 1318 (*Edna Valley*), which applied a de novo review to the issue of whether an award under section 1021.5 may encompass fees incurred in an administrative proceeding. The crucial difference between those cases and the instant case is that *Whitley* and *Edna Valley* involved novel questions of statutory interpretation. Although making a conclusory assertion that an issue of statutory construction is presented here, Appellants have not identified any such issue, and we do not address one in our analysis. Instead, the dispute before us is whether the already well-settled requirements for an award of

7

attorney fees under section 1021.5 have been satisfied based on the specific facts of this case. Accordingly, we determine whether the trial court abused its discretion, and we do not conduct a de novo review.

"An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice." (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158 (*Mejia*).) "[A]n attorney fees award under section 1021.5 will only be reversed where '"it is clearly wrong or has no reasonable basis."'" (*Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044.)

3.   *WPCC's Financial Interest Did Not Outweigh the Burden of Private Enforcement*

Applying the standard of review to the specific issue raised in this appeal, our main inquiry is whether "the court's finding that [WPCC's] personal interest did not outweigh the financial burden of private enforcement was manifestly unreasonable." (*Mejia*, *supra*, 156 Cal.App.4th at p. 159.)

Our Supreme Court in *Whitley* endorsed a specific method for a trial court to decide whether a fee award is warranted in light of the financial burden of private enforcement. "'The trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves. . . . Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome. . . . [¶] 'After

8

approximating the estimated value of the case at the time the vital litigation decisions were being made, the court must then turn to the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which may have been required to bring the case to fruition. . . . [¶] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case.'" (*Whitley*, *supra*, 50 Cal.4th at pp. 1215-1216.) Applying this method, "'[a] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by *a substantial margin* the actual litigation costs.'" (*Id.* at p. 1216, italics added.)[5]

Under the applicable approach, the first step is to attempt to estimate the monetary value to WPCC if it succeeded in obtaining the relief it sought in the petition. As we will

---

[5]     We note that in the reply brief, Appellants quote certain language that they claim to reflect the views of our Supreme Court in *Whitley*. First, they quote the statement that "'If the enforcement of the public interest is merely "coincidental to the attainment of . . . personal goals" [citation] . . . then [the necessity and financial burden] requirement is not met.'" (*Whitley*, *supra*, 50 Cal.4th at p. 1220.) Second, they quote the statement that "'[s]ection 1021.5 is intended as a "bounty" for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public.'" (*Ibid*.) Appellants misleadingly omit the internal quotation marks and fail to explain that *Whitely* quoted the language, which appears in earlier cases, to illustrate the unfortunately imprecise legal approach appearing in the preexisting case law. (*Ibid*.) Contrary to Appellants' suggestion, *Whitley* did not endorse the quoted language. (*Ibid*.) Under our Supreme Court's analysis, the test for whether the financial burden element is met for the purposes of section 1021.5 is the four-part test set forth in *Whitley*. (*Whitley*, at pp. 1215-1216.) It is *not* the more simplistic test of whether the litigants were motivated by their own interests while coincidentally serving the public, as stated in the quotes identified by Appellants.

explain, our analysis begins and ends at this step because there is no concrete and quantifiable monetary value of this case to WPCC's members that could be determined to exceed the actual litigation costs.

Initially, we note that the purported monetary benefit associated with this litigation is the preservation of real estate values in the Whispering Palms community. However, WPCC, which filed this action, is a nonprofit public benefit corporation that does not own real estate in Whispering Palms and thus does not stand to benefit financially from a successful lawsuit. That fact, however, does not end our analysis. Courts conducting the financial burden analysis required by section 1021.5 have looked to the financial benefit that the organization's *members* could obtain from the litigation. (See, e.g., *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1480 [organization "had a financial stake in this matter to the same extent as its members"]; *California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 570 [same].) We therefore focus on the monetary value of the litigation to WPCC's members, who are the homeowners in the Whispering Palms community.

As WPCC points out, it is impossible to accurately quantify the monetary value of this litigation to the members of WPCC. It is undisputed that at least certain members of WPCC believed that their property values would *decrease* if the Project were built as proposed. For example, WPCC newsletters mentioned the impact on property values as one reason to oppose the Project. Some property owners sent letters to the County expressing a belief that the Project, as proposed, would change the character of the community and would thus depress property values. One letter, from a homeowner who

10

worked as a real estate agent, attempted to quantify the financial impact of the Project by estimating how much property values could decline for a small *subset* of properties under a *worst-case scenario*, were the Project to be built. She explained that the 20 homes located adjacent to the Parcel would likely see a greater decrease in property values because of impacts on views and privacy, which could be *as much as* $300,000 per unit if the Project was built.[6] Appellants also point to a solicitation from WPCC to its members for funding for this litigation, which stated that "legal costs could approach $100,000" and that "[a]lthough this seems like a large sum, it is minimal when viewed as a percentage of the community's aggregate property values." That specific statement refers generally to the property values in the community to put the anticipated legal fees in perspective but does not make any assertion that filing the litigation would prevent a decrease in property values, let alone offer any specific quantification of the litigation's expected financial value to WPCC's members. Indeed, all of the evidence that Appellants rely on is far too vague and unspecific to permit any estimation of the monetary value of the litigation — if any — to WPCC's members.

_____

[6] The letter stated, "Over 20 homeowners would have 2nd story apartment dwellers looking directly down into the owners of Alcala homes on the north side of Via Galan. As well as the owners having their views impeded to looking at open sky to looking at back stairwells of apartments. Potentially this could be a security risk with such visual exposure of a gated community, namely which units are vacant for theft. This will seriously affect the value of all the homes in Alcala on this west side by as much as $300,000 per unit for loss of privacy and views based on my realtor qualifications of being a specialist in the Whispering Palms area." We note that, according to the WPCC newsletters in the record, approximately 600 families live in the Whispering Palms community, so that the letter quoted above was referring to the possible financial impact on a *small fraction* of the residents.

11

Further, in addition to the uncertainty about the amount by which the Project would decrease property values if built as planned, any financial benefit to WPCC's members from the litigation is wholly speculative because it is contingent on future events occurring after the conclusion of the litigation. The only relief sought by the petition was the requirement that an EIR be prepared before the County decides whether to approve the Project. The trial court could only speculate about what conclusions the EIR would reach and how Newport Pacific would respond to the EIR. Thus it was impossible for the trial court to know (1) whether the Project will eventually change from the current proposal as a result of the preparation of the EIR; and (2) how those possible changes to the Project might impact property values in Whispering Palms. If the Project ends up going forward as planned after the EIR is prepared, WPCC's members could experience a decrease in property values regardless of their success in this litigation.

It is undisputed that the members of WPCC *might* obtain a financial benefit after succeeding in this litigation because the Project *may* be changed or abandoned as a result of the EIR, which in turn *could* prevent a decrease in property values in the Whispering Palms community. However, any such benefit is completely speculative because it depends on future events. Under any scenario, the litigation will *not* result in the receipt of any *funds* that could be used to finance WPCC's litigation expenses. Under these circumstances, and because the monetary value to WPCC's members of the litigation is entirely speculative, the trial court could reasonably conclude that this case falls within

12

the scope of cases supporting an award of fees under section 1021.5.[7]  As one court has observed, when "there is no direct pecuniary benefit to petitioners in the judgment" and "any future money advantage for petitioners is speculative," those "factors tend to favor a grant of attorney's fees."  (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1127-1128.)[8]

Because of the vague and speculative nature of the possible monetary benefits to WPCC's members from the litigation, this case is very different from the main case cited by Appellants — *Schwartz v. City of Rosemead* (1984) 155 Cal.App.3d 547, 560.  In *Schwartz*, an individual property owner successfully filed a mandamus petition to require further review under CEQA of a power plant proposed to be built next to his property. (*Id*. at pp. 551-552.)  *Schwartz* concluded that the trial court was within its discretion to deny a fee application under section 1021.5 based on the expected monetary value to the property owner if he prevailed in the litigation, as opposed to the financial burden in bringing suit, because the property owner's "own estimation" was that the power plant "would diminish his property value by $100,000," and "[h]e claimed $22,000 in attorneys

---

[7]    Appellants contend that WPCC ignores the approach required by *Whitley* by failing "to perform any analysis of its financial burdens and incentives in the litigation." We disagree.  The analysis employed by WPCC and the trial court is consistent with *Whitley* because it focuses on the absence of a concrete and quantifiable financial interest in the litigation by WPCC's members.

[8]    In contrast, when, unlike here, "the benefits [the prevailing party] obtained are *immediately and directly translated into monetary terms*," the monetary value of the litigation has been found to weigh against an award of attorney fees. (*Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 113, italics added.)

13

fees in obtaining the writ." (*Schwartz*, at p. 560.) Here, in contrast, it is not possible to estimate the monetary value, if any, that WPCC's members would obtain from successful litigation.

The policy behind section 1021.5 also points toward the availability of a fee award in this case. As our Supreme Court has explained, attorney fees are available under section 1021.5 "[b]ecause public interest litigation often yields nonpecuniary and *intangible* or *widely diffused* benefits" (*Whitley*, *supra*, 50 Cal.4th at p. 1219, italics added), and "section 1021.5 . . . appears to be focused . . . on solving the problem of the nonaffordability of litigation that will benefit the public *but cannot pay its own way*." (*Id.* at p. 1225, italics added.) Awarding attorney fees in this case is consistent with the purpose for the statute, as the members of WPCC — although having an abstract and unquantifiable financial stake in the litigation — did not stand to obtain any direct monetary value from the litigation that could be used to pay for the litigation. A citizen group's interest in ensuring the preservation of a community's property values by advocating good land use decisions will often — as here — be too uncertain and abstract of a financial interest to preclude an award of attorney fees under section 1021.5 because that interest, although related to the preservation of property values, will not yield any funds to finance the litigation.

In sum, with respect to the financial burden element required for an award under section 1021.5, a fee award "'will be appropriate except where the expected value of the litigant's own monetary award exceeds by *a substantial margin* the actual litigation costs.'" (*Whitley*, *supra*, 50 Cal.4th at p. 1216, italics added.) Here, because it was not

14

possible for the trial court to estimate any expected value of the litigation to WPCC's members, the trial court was well within its discretion to determine that the monetary value of the case to WPCC's members did not exceed by a substantial margin the actual cost of litigation.[9]  We accordingly reject Appellants' contention that the trial court erred in concluding that this was an appropriate case in which to award fees under section 1021.5.

B.      *Fees for the Traffic Engineering Expert Should Not Have Been Awarded Under Section 1021.5*

Appellants contend that the trial court improperly included the amount of $5,287.50 incurred by WPCC in retaining a traffic engineer expert to prepare comment letters for submission to the County during the administrative proceedings.  According to Appellants, the inclusion of the traffic engineer's fee was improper because "section 1021.5 does not permit an award of expert witness fees to a prevailing party."

Appellants rely on *Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142 (*Olson*).  In *Olson*, our Supreme Court concluded that "neither the language nor the legislative history of section 1021.5 demonstrates that the statute permits an award of expert witness fees." (*Olson*, *supra*, 42 Cal.4th at p. 1148.)  As *Olson* explained, in the case of section 1021.5, the statutory language clearly limits the award to *attorney fees*, as it states that " '[u]pon motion, a court may award attorneys' fees to a

_____

9       We need not, and do not, decide whether the proper measure of the actual litigation costs in this case, for the purposes of the financial burden analysis is the amount of $141,303.37 that the trial court set forth in its fee award or some other amount, such as the amount of $66,986 that counsel for WPCC actually billed the client under a reduced fee arrangement.

successful party'" (*Olson*, at p. 1147), and "expert witness fees are not typically considered a subset of attorney fees; rather, attorney fees and expert witness fees are viewed as distinct and independent subsets of the costs of litigation." (*Id*. at p. 1148.) Further, *Olson* pointed out that expert witness fees could not generally be awarded as costs in conjunction with an attorney fee award under section 1021.5 because Code of Civil Procedure, section 1033.5, subdivision (b)(1) "provides that, unless expressly authorized by law, the fees of experts not appointed by the court are not allowable as costs." (*Olson*, at pp. 1149-1150.)

WPCC contends that the traffic engineer's fees should not fall under the rule expressed in *Olson* because those fees were incurred in the administrative proceedings before the County rather than in the proceedings in the trial court. The argument lacks merit. Recent case law establishes that attorney fees incurred in administrative proceedings necessary to exhaust administrative remedies prior to filing a lawsuit may — at the trial court's discretion — be included in a fee award because the administrative proceeding is part of the "action" referred to in section 1021.5. (*Edna Valley*, *supra*, 197 Cal.App.4th at p. 1320.) We conclude, however, that under this approach if the administrative proceedings are to be considered part of the *action*, the same rules for determining whether an expert witness fee is recoverable should apply to all parts of the action — both the administrative proceeding and the trial court proceedings. There is no basis in *Edna Valley* or any other authority cited by WPCC for allowing the recovery of expert witness fees incurred in an administrative proceeding but not during court proceedings, when both proceedings are part of the same action.

16

We accordingly conclude that the trial court improperly included in its fee award the amount of $5,287.50 incurred by WPCC in retaining a traffic engineer expert. We modify the attorney fee order to reduce the award by $5,287.50.

C.    *WPCC's Cross-appeal from the Amount of the Fee Award Lacks Merit*

WPCC's cross-appeal challenges the amount of the trial court's fee award. Specifically, WPPC contends that the trial court should have (1) applied a higher hourly rate in calculating the reasonable attorney fees incurred in the action; and (2) awarded a greater amount of fees for WPPC's participation in the prelitigation administrative proceedings.

We apply a deferential standard of review. When making an award of attorney fees, "the trial court has broad authority to determine the amount of a reasonable fee." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong"['] — meaning that it abused its discretion." (*Ibid.*)

We begin our analysis of whether the trial court abused its discretion by considering the standards that the trial court must apply in setting the amount of a fee award. "When a party is entitled to attorney fees under section 1021.5, the amount of the award is determined according to the guidelines set forth in [*Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)]." (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321.) "*Serrano III* requires the trial court to first determine a 'touchstone' or 'lodestar' figure

17

based on a 'careful compilation of the time spent and reasonable hourly compensation for each attorney . . . involved in the presentation of the case.' [Citations.] That figure may then be increased or reduced by the application of a 'multiplier' after the trial court has considered other factors concerning the lawsuit." (*Press*, at p. 322.) "*Serrano III* set forth a number of factors the trial court may consider in adjusting the lodestar figure. These include: '(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; [and] (6) the fact that the monies awarded would inure not to the benefit of the attorneys involved but the organizations by which they are employed.'" (*Press*, at p. 322, fn. 12.) "Just as a court has discretion to increase the lodestar under several factors in such a case, it may also decrease it by looking at those same factors . . . ." (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 160-161.) "'"There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation." [Citation.] There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar.'" (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 901.)

Here, WPCC sought a fee award in the amount of $307,181 (based on a proposed lodestar of $227,116.48 and requested multiplier), but the trial court awarded $141,303.37. The trial court followed the lodestar approach in determining the amount of fees to award. After determining a reasonable hourly rate, it declined to apply a multiplier — either positive or negative — to the lodestar figure associated with the trial court litigation. However, it applied a negative multiplier for the fees incurred during the prelitigation administrative proceedings before the County, reducing the lodestar amount by two-thirds.

1. *The Trial Court Did Not Abuse Its Discretion in Determining a Reasonable Hourly Rate of $350*

WPCC's first contention is that the trial court abused its discretion in arriving at the hourly rate for Hamilton, concluding that a reasonable hourly rate was $350 per hour instead of $425 per hour as requested by Hamilton. "Generally, the reasonable hourly rate used for the lodestar calculation 'is that prevailing in the community for similar work.'" (*Center for Biological Diversity v. County of San Bernardino*, *supra*, 188 Cal.App.4th at p. 616.) Here, the evidence supports the trial court's determination that $350 was a reasonable rate for Hamilton's work on the matter. As shown by a declaration, counsel for Appellants charged an hourly rate of $250 for this litigation, and for all new land use and environmental matters, he charges the rate of $325. A local attorney practicing land use and CEQA litigation submitted evidence that his firm charges public agency clients $250 to $315 per hour and charges private clients $325 to $375 per hour. He opined that the prevailing market rate for experienced lawyers

19

working for private clients in CEQA litigation is $325 per hour.  In light of this evidence, the trial court was well within its discretion to arrive at $350 as a reasonable hourly fee for Hamilton's work.

WPCC argues that the trial court abused its discretion in arriving at the hourly rate of $350 because it purportedly took into account the fact that Hamilton had charged WPCC a reduced rate of $225 per hour, rather than considering the reasonable rate charged by comparable attorneys for comparable work.  We agree that the trial court would have applied an improper standard had it arrived at a reasonable hourly rate by taking into account the reduced rate charged by Hamilton.  "'"The reasonable market value of the attorney's services is the measure of a reasonable hourly rate.  [Citations.] This standard applies regardless of whether the attorneys claiming fees charge nothing for their services, charge at below-market or discounted rates, represent the client on a straight contingent fee basis, or are in-house counsel."'"  (*Center for Biological Diversity v. County of San Bernardino*, *supra*, 188 Cal.App.4th at p. 620.)  However, we reject WPCC's characterization of the trial court's reasoning.  According to our review of the record, the trial court made very clear that it was arriving at the hourly rate of $350 for Hamilton's work by considering the evidence submitted by Appellants and its own experience with similar cases — *not* the rate Hamilton charged her client.  The trial court's order mentions the fact that Hamilton charged WPCC the hourly rate of $225, but it does so in explaining that it is not applying a multiplier to account for Hamilton's risk associated with the case, not in explaining how it arrived at a reasonable hourly rate.

2. *The Trial Court Did Not Abuse Its Discretion in Applying a Negative Multiplier for the Fees Incurred Prior to Filing the Litigation*

WPCC's second contention is that the trial court abused its discretion by applying a negative multiplier of two-thirds to the fees that Hamilton incurred in representing WPCC in the administrative proceedings before the County prior to filing this litigation.

WPCC requested a fee award for 182 hours of work by Hamilton and 36 hours by her staff in the administrative proceedings before the County. As Hamilton's time records show, she was first retained in 2006 to perform work for WPCC to oppose the Project during the administrative review process. During the period between 2006 and the February 2010 filing of this lawsuit, Hamilton was involved in commenting on an earlier version of a mitigated negative declaration from the County, and then in commenting on a new version of the mitigated negative declaration that was circulated in mid-2009 and is the subject of this lawsuit.

WPCC contends that the trial court abused its discretion in applying a negative multiplier to the fees associated with the administrative proceedings as "[a]ll of the pre-litigation fees were necessary to exhaust administrative remedies prior to filing a CEQA challenge[,]" and "WPCC should not be required to absorb 2/3 of these fees because [the County] took 2½ years to decide to prepare a new [mitigated negative declaration] rather than provide the response to comments the County led WPCC to believe would be forthcoming." In short, WPCC believes that because it was the County, not WPCC, that prolonged the administrative proceedings, the trial court should not have reduced the award for the fees associated with those proceedings.

21

Although participation in an administrative proceeding necessary to exhaust administrative remedies prior to filing a lawsuit is considered part of the "action" for the purpose of awarding fees under section 1025.1 (*Edna Valley*, *supra*, 197 Cal.App.4th at p. 1320), the trial court is not required to include all such fees in its award. "[T]he trial court must consider the extent of the parties' participation in the administrative proceeding and the cost and time necessary to reasonably prepare for a challenge to these proceedings. The fees the court deems appropriate may range from no fees to reasonable fees under the circumstances." (*Ibid*.) Here, based on its understanding of the administrative record and Hamilton's time records, which it had before it, the trial court concluded that it would be "excessive" to award fees associated with the entire 218 hours expended by Hamilton and her staff during the administrative proceedings from 2006 to 2010, as much of that work was performed two to four years prior to the litigation and involved a different version of the mitigated negative declaration. Applying the deferential standard applicable to our review of the fee award, we reject WPCC's contention that the trial court erred. The trial court had a reasonable basis for its decision and applied the proper legal standards. It therefore did not abuse its discretion in reducing the lodestar amount for the fees incurred prior to the filing of the litigation in the trial court.

DISPOSITION

The order awarding attorney fees to WPCC is modified to reduce the award by

$5,287.50.  As modified, the order is affirmed.  The parties shall bear their own costs.

_____
IRION, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
HUFFMAN, J.

23