Filed 7/23/24  Coronado Citizens etc. v. City of Coronado CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CORONADO CITIZENS FOR TRANSPARENT GOVERNMENT, | D082360 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2020-00044167-CU-TT-CTL) |
| CITY OF CORONADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Reversed.

Burke, Williams & Sorrensen and Johanna N. Canlas; The Sohagi Law Group, Margaret M. Sohagi, Robert Tyson Sohagi, and Mark J. Desrosiers for Defendant and Appellant City of Coronado.

Remy Moose Manley, Sabrina V. Teller, and Louisa I. Rogers for Amicus Curiae on behalf of League of California Cities and California State Association of Counties.

Briggs Law Corporation, Cory J. Briggs and Janna M. Ferraro for Plaintiff and Respondent Coronado Citizens for Transparent Government.

Coronado Citizens for Transparent Government (Citizens) raised a number of objections under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] to the City of Coronado's (the City) approval of a plan to build a wastewater treatment plant and modernized maintenance building on a municipal golf course. The City found that the project, as mitigated, would have no significant environmental effects; accordingly, it adopted a mitigated negative declaration and approved the project.

Citizens filed this lawsuit seeking a writ of mandate to stop the project. The trial court found three of Citizens's CEQA objections had merit, concluding that there was substantial evidence supporting a fair argument that the project would have a significant impact on the environment due to seismology, a nearby eelgrass habitat, and aesthetics. The court issued a writ of mandate requiring the City to prepare an environmental impact report (EIR).

Based on our independent review of the record, we conclude that there is no substantial evidence from which Citizens can fairly argue that the project as mitigated would have a significant impact on the environment due to seismic hazards or effects on the eelgrass habitat. We also conclude that there is no substantial evidence that the project will have a significant detrimental impact on aesthetics. Accordingly, we reverse.

I.

BACKGROUND

A.  *Legal Background*

"CEQA generally requires a state or local public agency to prepare an EIR on any activity it undertakes or approves which may have a significant

---

[1]     Further undesignated citations are to the Public Resources Code.

2

effect on the environment." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1371 (*Gentry*).) However, such agency may instead adopt a " 'mitigated negative declaration' " if the effects can be mitigated "to a point where clearly no significant effect on the environment would occur" and "there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5.)

B.     *Factual and Procedural Background*

Since at least 2011, the City has been investigating "the feasibility of developing a new recycled water supply." The City conducted several studies with stakeholders over the years, considering three potential sites for a facility. By 2020, the City had identified a final proposed site and put forward a plan to build a wastewater treatment plant on the Coronado Municipal Golf Course, next to the San Diego Bay, to provide recycled irrigation water for the course and other public landscaping.

"The project's primary purpose is to reduce potable water usage by producing and distributing high-quality recycled water for use as public landscape irrigation." "Pump stations and pipelines necessary to connect the [treatment plant] to the existing municipal wastewater collection system and to distribute recycled water would be constructed, including several miles of new recycled water pipeline." Treated water would be temporarily stored in an outdoor pond incorporated into the landscaping of the golf course. The proposed project would "reconfigure certain Golf Course holes to accommodate the proposed facilities," and it would include a new maintenance road running through the course.

As part of this project, the City also plans to demolish an existing maintenance building on the golf course and build a modern facility on the

3

same site as the water treatment plant. "The project would also include development of an approximately 500–1,000-square-foot coastal vista located near an existing pocket beach along the coastline of San Diego Bay" that "would provide passive recreational opportunities for the public."

The City prepared drawings for two slightly different designs for the project:





After providing notice, receiving comments, and holding a public hearing, the City issued a final mitigated negative declaration (the Declaration), concluding that the project as mitigated by specified measures would not have a significant impact on the environment. As part of this process, the City received and considered public comments. Among the concerns raised by the commenters were: (1) seismological hazards at the proposed site; (2) potential effects on an adjacent eelgrass habitat; and (3) aesthetic considerations.

Citizens is an association comprising at least three of the concerned commenters. After the City adopted the Declaration, Citizens filed this lawsuit, seeking an order that the City conduct a full EIR.

After considering the parties' arguments and the administrative record, the trial court granted Citizens's petition in part.[2] The court concluded that "maps and diagrams" and a report from the San Diego Chapter of the Earthquake Engineering Research Institute submitted by Citizens constituted "substantial evidence support[ing] a fair argument that the Project will result in significant [seismologic and/or geologic] impacts." The court also found that the City had not shown that "the regulations and measures it plans to rely upon [to mitigate potential effects] . . . are appropriate to ensure impacts [on the nearby eelgrass habitat] are not significant" because the caselaw cited by the City did "not assess the issues under the applicable standard for reviewing an agency's decision to adopt a" mitigated negative declaration. Finally, the court held that because a "planned landscape berm [designed to hide the plant] could itself cause a visual/aesthetic impact," and "new lighting is proposed in an area that does not currently have lighting," the City needed to prepare a full EIR addressing aesthetic impacts.

The City appealed. The League of California Cities and California State Association of Counties have filed a joint amicus brief in support of the City.

---

2    The court dismissed Citizens's claims under the Seismic Hazards Mapping Act and Alquist-Priolo Earthquake Fault Zoning Act. Those claims are not at issue in this appeal. (See, e.g., *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585 (*Preserve Poway*) [" 'To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants.' "].)

II.

DISCUSSION

A. *Standard of Review*

1. *Administrative Standard*

Under CEQA, a city may adopt a mitigated negative declaration rather than an EIR if environmental "effects can be mitigated into insignificance." (*San Bernardino Valley Audubon Soc'y v. Metro. Water Dist.* (1999) 71 Cal.App.4th 382, 402.) "Mitigation measures stated in a [mitigated negative declaration] need not specify precise details of design. Having recognized a significant environmental impact and having determined that mitigation measures may reduce the impact to insignificance, the [mitigated negative declaration] may leave the details to engineers." (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 400–401.)

"In challenging the agency's decision to adopt a mitigated negative declaration, the party opposing the Project, Citizens, [has] the burden [of] present[ing] substantial evidence of a fair argument that the mitigation measures are inadequate to avoid the potentially significant effects." (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1332 (*Grand Terrace*).) This standard "creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316–1317.) "If there is substantial evidence of a significant environmental impact, evidence to the contrary does not dispense with the need for an EIR when it still can be 'fairly argued' that

7

the project may have a significant impact."  (*City of Livermore v. Local Agency Formation Com* (1986) 184 Cal.App.3d 531, 540.)

A " 'significant effect on the environment' " is "a substantial, or potentially substantial, adverse change in the environment."  (§ 21068.) "Substantial evidence" includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."  (§ 21082.2, subd. (c).) "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment, is not substantial evidence."  (*Ibid.*)

2.    *Appellate Review*

This court independently "review[s] the record and determine[s] whether there is substantial evidence in support of a fair argument [the proposed project] may have a significant environmental impact." (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1603.)  The question is whether substantial evidence in the record includes "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."  (Cal. Code Regs., tit. 14, § 15384.)

In performing this assessment, we "conduct[ ] a de novo review of the record."  (*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 151.)  We only "defer to the lead agency's weighing of credibility [for] questions involving *disputed* factual questions going to *credibility*."  (*Grand Terrace, supra*, 160 Cal.App.4th at p. 1340.)

8

B.    *The Scope of the Record*

Both parties have cited to aspects of a "supplemental administrative record" they concede is not part of the record in this case.  This supplemental administrative record relates to a second petition filed by Citizens, which was consolidated with and then deconsolidated from this action.  The allegations of the second petition post-date the issues raised in this appeal.  It appears that petition is still pending in the trial court.

"[C]ourts generally may not consider evidence not contained in the administrative record when reviewing the substantiality of the evidence supporting a quasi-legislative administrative decision under Public Resources Code section 21168.5."  (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565.)  We must rather assess whether the administrative record that was relied on by the City to inform its decision to issue the Declaration was sufficient.  (See § 21064.5 [agency may issue mitigated negative declaration if it is warranted "in light of the whole record before the public agency"].)

The City claims that its use of the extra-record evidence falls within exceptions to the general rule.  The City specifically argues that this evidence rebuts Citizens's claim made in the trial court that " 'further [geotechnical] review would likely never happen.' "  Although the City claims this evidence "is used to demonstrate [Citizens's] presumptions of regulatory noncompliance are moot and lack a remedy," the arguments the City seeks to rebut did not pertain to the CEQA issues raised in this appeal.  Rather, Citizens was arguing that "the City failed to comply [*sic*] the [Seismic Hazards Mapping Act] and [Alquist-Priolo Earthquake Fault Zoning Act] before approving the Project."  Citizens has failed to file a cross-appeal that

9

would preserve its right to challenge the trial court's dismissal of these claims. (See *Preserve Poway*, *supra*, 245 Cal.App.4th at p. 585.) The City thus has no need to rely on extra-record evidence to rebut Citizens's "attempt[s] to improperly resurrect its failed Seismic Hazard Mapping Act and Alquist-Priolo Act allegations, despite losing these arguments in the trial court and not filing a cross-appeal."

Although Citizens cites and makes arguments based on the supplemental records, it argues that we may not consider the extra-record evidence and fails to make any arguments in the alternative. (Citing, e.g., *Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 366, fn. 8 [" 'Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs.' "].) We thus have no occasion to consider either party's extra record evidence or arguments based thereon.

C.    *Sufficiency of the Declaration*

We must resolve three principal disputes regarding the Declaration. First, is there substantial evidence in the record to support a fair argument of potentially significant seismic impacts due to the project? Second, is there substantial evidence in the record to support a fair argument of potentially significant impacts on a nearby eelgrass habitat? Third, is there substantial evidence in the record to support a fair argument of potentially significant aesthetic impacts? We address each in turn.

1.    *Seismic Impacts*

Under the CEQA Guidelines, a project may have a significant impact on the environment if it would "[d]irectly or indirectly cause potential substantial adverse effects, including the risk of loss, injury, or death involving:" "[r]upture of a known earthquake fault"; "[s]trong seismic ground

10

shaking"; or "[s]eismic-related ground failure, including liquefaction."
(Cal. Code Regs., tit. 14, appen. G, § VII.)

Prior to adopting the Declaration, the City commissioned a geotechnical study from licensed geologists to assist with the design of the project by "evaluat[ing] geologic hazards and develop[ing] preliminary assumed geotechnical recommendations for use in the conceptual design of the proposed project." The study includes "a site response characterization and evaluation of seismic design parameters for the proposed project based on American Society of Civil Engineers Minimum Design Loads and Associated Criteria for Buildings and Other Structures (ASCE 7-16) methods" that have since been incorporated into the California Building Code. The report notes that the project site "is underlain by potentially liquefiable soil and therefore is classified as Site Class F in accordance with Table 20.3-1 of ASCE 7-16 . . . [and] requires that a site response analysis in accordance with Section 21.1 shall be performed for" any buildings with "fundamental periods of vibration equal to or less than 0.5" seconds.

Despite relying on aspects of the City's geotechnical report in support of its own arguments, Citizens argues that the City improperly relied on this report because it

> "included numerous disclaimers, including that the evaluation was only 'preliminary,' that it 'was not intended to provide parameters for final design of the proposed project,' that it 'did not include geotechnical evaluation of the proposed pipeline alignments,' and that 'the presence of previously unmapped faults crossing the [project site] cannot be precluded at the present time.' "

However, a mitigated negative declaration is always based on the agency's "initial study." (§ 21064.5.) "An initial study *may* rely upon expert opinion supported by facts, technical studies or other substantial evidence to

11

document its findings. However, an initial study is neither intended nor required to include the level of detail included in an EIR." (Cal. Code Regs., tit. 14, § 15063, subd. (a)(3), italics added.) Citizens does not point to any technical information missing from the report that would prevent the City or its consultants from fairly evaluating potential hazards at the site for purposes of an initial study. Nor does Citizens explain why geotechnical evaluation of the proposed pipeline alignments would be necessary in light of the proposed mitigation measures for all new pipes (as discussed *post*). And, the possible presence of a currently unknown fault line is wholly speculative and cannot constitute substantial evidence of a significant impact. (§ 21080, subd. (e)(2).) Citizen does not present any expert evidence that rebuts or criticizes the City's geotechnical report. Accordingly, we conclude the City reasonably relied on the report and its recommendations.

The City concluded "the project's future visitors could be exposed to strong seismic ground shaking in the event of an earthquake." However, with respect to the risk of building collapse or damage in the event of an earthquake, the City concluded:

> "Appropriate measures to minimize the effects of earthquakes and other geotechnical hazards are included in the California Building Code, with specific provisions pertaining to seismic load and design. The California Building Code [(CBC)] has been adopted by the City as the Building Code of the City of Coronado, pursuant of [Coronado Municipal Code] Section 70.20.010. Design and construction of the project in accordance with the California Building Code would minimize the adverse effects of strong ground shaking to the greatest degree feasible."

The City noted:

> "The earthquake design requirements of the CBC take into account the occupancy category of the structure, site class, soil classifications, and various seismic coefficients, which are used to determine a Seismic Design Category (SDC) for a project. The

12

SDC is a classification system that combines the occupancy categories with the level of expected ground motions at the site and ranges from SDC A (very small seismic vulnerability) to SDC E/F (very high seismic vulnerability and near a major fault). Design specifications are then determined according to the SDC. The proposed project would be required to comply with the CBC, including Part 2, Volume 2, Chapter 18, Soils and Foundations, which outlines the minimum standards for structural design and construction."

In addition, as part of the project, chemicals currently stored on the golf course would be moved from an older building to a newly constructed building subject to more stringent earthquake requirements and stored in new containment vessels designed to capture 110 percent of the stored chemicals in the event of a leak.[3] This will reduce hazards to people and the environment compared to existing conditions.

The City also found that there was a significant risk of soil liquefaction. According to the Declaration:

"Seismically induced soil liquefaction is a phenomenon in which loose to medium dense, saturated granular materials undergo matrix rearrangement, develop high pore water pressure, and lose shear strength due to cyclic ground vibrations induced by earthquakes. Manifestations of soil liquefaction can include loss of bearing capacity below foundations, surface settlements and tilting in level ground, and instabilities in sloping ground. Soil liquefaction can also result in an increase in lateral and uplift pressures on buried structures."

The geotechnical study identified a "moderate to high potential for liquefaction to a depth of 35 feet below ground surface," and "a low to very low potential for" deeper liquefaction. Accordingly, "[l]iquefaction would most likely manifest itself as local ground subsidence and settlement," including

---

[3] Citizens suggests that this is a new hazard posed by the project. However, the Declaration makes clear that the chemical storage facilities "are replacing existing similar features currently in use at the Golf Course."

13

"ground surface settlement on the order of 8 to 10 inches."  The City has concluded that "liquefaction-induced settlement could cause extensive damage and potentially catastrophic failure of structures supported on foundations located above and in the liquefiable layers."

However, the Declaration identified a number of measures aimed at mitigating the risk of soil liquefaction, including:  (1) all foundations for proposed structures will be designed to withstand "assumed seismic-induced liquefaction settlement on the order of 6 to 9 inches"; (2) as necessary, "use of base isolation system to reduce the amount of vibration transmitted to the support slabs"; and (3) "positive drainage . . . around the perimeter of all proposed buildings."

The Declaration also notes mandatory compliance with chapter 18 of the California Building Standards Code (Cal. Code Regs., tit. 24), which requires:  (1) a record of the soil profile; (2) evaluation of active faults in the area; and (3) recommendations for foundation type and design criteria that address the bearing capacity of soils, expansive soils and liquefaction, and settlement and varying soil strength on the site.  Specific anticipated mitigation measures to comply with CBC include "ground modifications and/or the use of deep foundations."  The Declaration provides that, in accordance with the CBC, "[t]he Design-Build Contractor shall perform a site-specific geotechnical investigation for the selection and design of the appropriate features based on the actual design of the project."

With respect to the risk of pipe rupture, the Declaration observes that compliance with the California Plumbing Code, chapter 6, mandates installation of flexible underground pipes, seismic thrust blocks to prevent pipe ruptures, shut-off valves for emergencies, material selection to resist permanent ground deformation, and welding methods to resist thrust.

14

Citizens claims that the project will be built "directly on top" of an active fault, citing a map excerpted from an academic article and included in a public comment as well as a zoomed-in map created by the commenter. The source material for the first map is not in the record; nor does the comment reflect how the commenter created the second map. The City reasonably concluded, "The manner in which the image was created is unknown[,] as is its accuracy."

In any event, Citizens acknowledges that the commenter is not an expert in seismology.[4] (See, e.g., *Hilltop Group, Inc. v. County of San Diego* (2024) 99 Cal.App.5th 890, 919 [declining to consider comments on noise impacts where the challenging party did not argue that commenters "were experts or qualified to contribute expert testimony"].) "A lay person's opinion based on technical information that requires expertise does not qualify as substantial evidence." (*Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 789 (*Newtown*).) Mapping faults unquestionably requires specific geotechnical information and expertise.

By contrast, the City's geotechnical report, appended to the Declaration, found that "the results of the geotechnical investigation at the [project site] and previous studies in the general vicinity . . . do not indicate that fault surface rupture is a significant geologic hazard." The City also observes that, by law, structures cannot "be placed across the trace of an active fault," and areas within 50 feet of an active fault are presumed to be over an active fault. (Cal. Code Regs., tit. 14, § 3603, subd. (a).) We have no

---

4    Although the parties have robustly briefed this commenter's credentials, they agree he is not an expert in seismology. We therefore deny the City's opposed request that we take judicial notice of dictionary definitions the City claims are relevant to his credentials because these definitions are not helpful to our analysis or disposition.

15

reason to assume, in the absence of substantial evidence, that the City will ignore this requirement.

Aside from this issue, the parties do not materially dispute the degree of seismic activity in the area. For example, the parties agree there is a significant risk of an earthquake during project's life due to the proximity to the Rose Canyon Fault Zone. Both parties also identify soil liquefaction as a risk that could lead to potentially significant impacts on the environment.

As noted *ante*, the City has concluded that the risks created by the area's seismic activity can be mitigated into insignificance. By contrast, Citizens fails to point to any substantial evidence that would tend to show that the City's proposed mitigation measures are insufficient to mitigate the seismic and geologic risks.

Aside from the Declaration itself, which concludes that risks can be mitigated through specific measures, Citizens principally relies on a report from the San Diego Chapter of the Earthquake Engineering Research Institute (the EERI Report). However, that report does not provide geotechnical information contrary to the City's and does not suggest that the City's proposed mitigation measures are ineffective. Citizens highlights passages noting that existing wastewater infrastructure is vulnerable, failing to note that the EERI Report recommends "redundancies that alleviate dependencies on the [existing] infrastructure most vulnerable to fault rupture including main interceptor trunk lines and the Point Loma Wastewater Treatment facility." The Report observes that "[m]uch of the utility lifeline infrastructure in the San Diego area was built without the full recognition of the potential surface fault rupture or liquefaction ground failure that could be generated by the Rose Canyon Fault Zone." Satellite

16

wastewater treatment plants built with modern knowledge of seismology and engineering are recommended, not discouraged by the report.

Indeed, the EERI Report emphasizes the need for modern infrastructure in general, suggesting that "[w]astewater utilities prioritize investments in resilience-building measures like system upgrades," and citing "[b]uilding codes and land use regulations" as earthquake preparedness measures. The EERI Report emphasizes the "poor seismic resistance of . . . *older* buildings and infrastructure systems" and notes the problems of "*older*, more seismically vulnerable buildings *constructed before modern seismic design provisions* were in place." (Italics added.) The City considered the EERI report and reasonably concluded it did not support the need for different or additional mitigation measures.

To the extent Citizens directly responds to the City's proposed mitigation measures at all, it argues generally that we should disregard regulatory mandates, including building and plumbing codes, listed in the City's Declaration as mitigating measures. Citizens cites no authority for the proposition that a lead agency may not rely on mandatory regulatory compliance to demonstrate that a project's potential impacts on the environment will be mitigated into insignificance.

In fact, it is well established that "[a] condition requiring compliance with environmental regulations is a common and reasonable mitigating measure." (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 308 (*Sundstrom*) [addressing a mitigated negative declaration].) Such conditions are acceptable if the agency had "meaningful information reasonably justifying an expectation of mitigation of environmental effects." (*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1355.)

17

Thus, one court found that conditions in a mitigated negative declaration that committed the agency "to mitigating the impact of a recognized potential environmental effect and articulate specific performance criteria" through compliance with other agencies' regulations were adequate. (*Gentry, supra,* 36 Cal.App.4th at p. 1396.) Another found that a challenger's concerns about potential tree removal could not give rise to an arguably significant impact in light of a city policy requiring replacement of any trees removed. (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 90–91; see also *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 904 [despite the existence of seismic hazards at a proposed project site, EIR's proposed "compliance with the Building Code, and the other regulatory provisions, in conjunction with the detailed Geotechnical Investigation, provided substantial evidence that the mitigation measures would reduce seismic impacts to a less than significant level"].)

Finally, although not referenced in Citizens's brief on appeal, we note that one association member commented, "I am not aware of any mechanisms to mitigate this significant environmental impact of the project short of relocating to a seismically stable location without exacerbating other significant impacts or completely rethinking how to solve the stated objective of drought-proofing the golf course." Citizens does not claim that this commenter has technical expertise that would tend to show that his personal knowledge is relevant to the existence of adequate mitigative measures. In any case, a statement by the commenter that he is not aware of any mitigative measures does not show that there is a conflict of opinion in the record. (See *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 621 (*San Joaquin*) [A lay witness for San Joaquin Raptor/Wildlife Rescue Center (SJR) commented, " 'We also

18

don't know whether or not the swains and hawks or other sensitive species, candidate threatened or endangered species are in this area because we don't have this inventory.'" The *San Joaquin* court found, "This is not a conflict of opinion. It is a unanimous opinion which SJR seeks to challenge with a statement saying in essence 'I know nothing.'"].) This lay opinion is not substantial evidence. (See *Newtown, supra*, 65 Cal.App.5th at p. 789.)

In sum, Citizens has not adduced substantial evidence that the seismic hazards are more significant than the City represents and has not created a fair argument that the mitigation measures encompassed in the project are inadequate.

2. *Biological Impacts on Eelgrass Habitat*

Citizens claims that the project's proximity to the San Diego Bay will necessarily lead to a significant impact on the marine eelgrass habitat. Citizens argues: "As far as mitigation for potential spills/pollution release, all that is discussed in the [Declaration] is that construction and operation will comply with the law and be carefully managed. However, in addition to the earthquake-related measures discussed *ante*, the City has pointed to multiple, specific mitigation measures to address these hazards.

To combat potential effects of construction, "[h]azardous materials would be stored in designated areas away from environmentally sensitive areas in quantities that would not pose significant hazard to the public in the event of a release." "[T]he transport of hazardous materials to and from the project site would be conducted by a licensed contractor," and "storage would be required to comply with the guidelines set forth by each product's manufacturer." "Any handling, transport, use, or disposal of hazardous materials would comply with all relevant federal, state, and local agencies and regulations, including the U.S. Environmental Protection Agency, the

19

California Department of Toxic Substances Control, the California Occupational Safety and Health Administration, Caltrans, the Resource Conservation and Recovery Act, the [San Diego County Air Pollution Control District]." In addition, the project contractor will be required to adopt a Stormwater Pollution Prevention Plan (SWPPP) to ensure that stormwater discharges will not cause or contribute to a violation of any applicable water quality standard. Such SWPPP will require inspections of all best management practices implemented throughout construction.

As for operation of the facility, the water treatment plant will use an ultraviolet light and filter system rather than chemical treatment, obviating the need for storage of additional chemicals onsite. "[N]o liquid waste would be transported off site" as a matter of routine operation, minimizing the potential for spills. "Operational protocols will be incorporated into the facility so that if there is significant rain in the forecast, recycled water production rates would be decreased, and the surface level of the pond would be lowered in advance to account for runoff into the pond to minimize the risk of overtopping." The "facility would be shut down in advance of a forecasted rain event, which could produce a significant flood." The project will also be graded so the "recycled water storage pond is contained by topography and prevents discharges to the bay under typical design storm runoff quantities." The plant would adopt a SWPPP for ongoing operation as well and would be required to adhere to applicable regulations, including those issued by the California Department of Toxic Substances Control and the California Occupational Safety and Health Administration.

Citizens argues that because it "presented substantial evidence supporting a fair argument that the Project could have a significant impact on the . . . eelgrass habitat," the City's proposed mitigation measures,

20

including "compliance with the law and/or the promise of careful management[,] [do] not negate that fair argument." Citizens seems to misunderstand the applicable CEQA statutes. It does not matter if there is a potentially significant impact *in the absence of* mitigation measures if such measures render the effects of the project less than significant. (See § 21080, subd. (c)(2).) Citizens cannot carry its burden by simply ignoring mitigation measures. (See *Grand Terrace, supra,* 160 Cal.App.4th at p. 1333 [challengers must " 'demonstrate by substantial evidence that the proposed mitigation measures are inadequate and that the project as . . . mitigated may have a significant adverse effect on the environment' "].) Aside from its unfounded argument that regulatory compliance cannot constitute mitigation, which we addressed *ante*, Citizens makes no argument and adduces no evidence that the City's proposed mitigation measures are insufficient to negate potentially significant impacts on the eelgrass.

3. *Aesthetic Impacts*

The parties dispute whether the project will have a substantial effect on aesthetics. Aesthetic considerations include whether a project will: have "a substantial adverse effect on scenic vista"; "substantially damage scenic resources"; "substantially degrade the existing visual character or quality of the site and its surroundings"; or "create a new source of substantial light or glare which would adversely affect day or nighttime views in the area." (*Preserve Poway, supra,* 245 Cal.App.4th at p. 578, citing Cal. Code Regs., tit. 14, appen. G, § I.) Such considerations extend to " 'impacts on public and private views and on the . . . character of the project site and surrounding area.' " (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 693.) Lay witness testimony may constitute substantial

21

evidence of a significant aesthetic impact. (*Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 375.)

However, "[t]he possibility of significant adverse environmental impact is not raised simply because of individualized complaints regarding the aesthetic merit of a project." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 376 (*Eureka*).) "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492.)

### a. *Scenic Vistas*

Citizens contends the project will impinge upon scenic views of the San Diego Bay. The City argues, among other things, that the buildings proposed will "be one-story, screened by existing topography, mature trees and landscaping, and characteristic of small buildings currently on the course." In addition, the Declaration includes renderings of the proposed project that reflect that the public will continue to enjoy a direct line of sight from the street and public bike path on the 400 block of Glorietta Blvd. (west of the project) to San Diego Bay:



EXISTING VIEW
FROM BIKE PATH/400 BLOCK



PROPOSED CONCEPT A
FROM BIKE PATH/400 BLOCK



PROPOSED CONCEPT B
FROM BIKE PATH/400 BLOCK

The photo and renderings indicate that the project site is downhill from the public street and that the proposed project is neither prominent nor obstructive.

The renderings and project drawings also indicate that golfers will continue to enjoy views of the water from reconfigured holes 1 and 3, which will be close to the project site.



Proposed Concept A
View from new #1 green toward bay



**Proposed Concept B**
View from new #1 green toward bay



**Proposed Concept A**
View from new #3 fairway toward #3 green



Proposed Concept B
View from new #3 fairway toward #3 green

The rendering closest to the project—a view from reconfigured hole 2—indicates that the view of the bay may be blocked but does not reflect that the landscaped berm or new structures will be obtrusive.



Proposed Concept A
View from new #2 tee toward #2 fairway



Proposed Concept B
View from new #2 tee toward #2 fairway

28

In support of its argument that the project will have a significant aesthetic impact, Citizens cites to a number of public comments, the majority of which are mere conjecture and do not constitute substantial evidence. For example, multiple comments simply assert that the project will block views, without any factual basis for such an assertion. Given the City's renderings and project description, the commenters' claims lack support.

Several comments assert, "[p]resumably, poles with netting would be required to protect employee and maintenance vehicles from flying golf balls, further degrading and indeed blocking the scenic vista." However, this is simply untrue as the City explained to these commenters that, "no additional netting or poles would be required."

One commenter states:

"This is a high visibility project and a better effort could be made on the look of the buildings. Coronado is not a poor city, so the buildings should be architecturally pleasing with a low profile. An industrial style building would be appropriate . . . in the proper zoning, but not in this situation in a highly visible area of Coronado."

The Declaration, including the renderings, reflects that the buildings *are* low-profile, below grade, and unobtrusive. As for concern about "architecturally pleasing" buildings, although aesthetics are necessarily subjective to some degree, "individualized complaints regarding the aesthetic merit of a project" are not sufficient to raise a fair argument of substantial impact. (*Eureka*, *supra*, 147 Cal.App.4th at p. 376.)

Citizens arguably has adduced substantial evidence in the form of photos taken of "story poles" placed by the City to mark out the location of the proposed buildings.

29













But it is unclear that these photos reveal much about the impact on scenic

vistas for the public at large as they were taken using a telephoto lens while

the photographer was standing on the golf course.  As one commenter noted,

> "With the story poles, *it was impossible to tell from the 400 and 500 blocks of Glorietta Blvd.[ ] just where the buildings would be located*, as the poles were hidden behind natural vegetation. However, if one were to connect the poles to display the whole faces of the proposed buildings, the blockage of the views is

32

obvious.  To understand how the poles demonstrated that, one had to take pictures *with a telephoto lens from closer to the Bay, moving around the trees and other vegetation.*"

(Italics added.)  The one photo purportedly taken from the public bikeway does not show that any views will be blocked by the project buildings.



In any event, Citizens, at best, raises a fair argument that some golfers will be unable to see the water from some vantage points on the golf course due to the project.  "[O]bstruction of a few private views in a project's immediate vicinity is not generally regarded as a significant environmental impact." (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 586–587 ["It appears that some nearby residents may have [their] view diminished by the Project, but as the City pointed out, the neighbors to the east will be unaffected, and relatively few to the west will be affected . . . .  Given the

limited scope of the impact, the Project's effect on scenic views cannot be considered environmentally significant."].)  There is no evidence suggesting that views of the bay from any private home or public right of way will be impeded, and golfers will continue to enjoy views from most places on the golf course.

The parties dispute whether we can consider that "[t]he project would . . . include development of an approximately 500–1,000-square-foot coastal vista located near an existing pocket beach along the coastline of San Diego Bay near the number 2 and/or 18 greens," and "would also provide for the demolition of the existing [maintenance building], thereby improving the visual environment along Glorietta Boulevard in comparison to existing conditions."  We need not resolve this dispute.  Whether or not it is appropriate to consider that the project will create additional views of the bay, the record clearly establishes that the negative effect on scenic vistas is not significant.[5]

b. *New Road and Parking on Golf Course*

Citizens claims that the Declaration was deficient because it failed "to show how the new road, employee parking lot, and traversing trucks would impact aesthetics and views."  The association cites public comments claiming that these features would have a significant impact on the environment.  This is not supported by the record.

As an initial matter, the City's plans *do* show where the proposed new road and employee parking lot would be located.  The City's renderings

---

[5]    For the same reason, we need not consider the City's proffer of "CEQA Guidelines that permanent protection of off-site resources through conservation easements constitutes mitigation."  Because these guidelines are not relevant to our analysis, we deny the City's request for judicial notice.

reflect that the landscaped berm,[6] below-grade design, and landscaping will shield most or all of the new employee parking lot from view. We doubt whether views of a paved access road would significantly affect views in this highly developed area, as a road is not inconsistent with the current aesthetic environment. Indeed, there is a larger parking lot on the golf course already, near the clubhouse area. Even so, photos of the course (including those reproduced above) and the project drawings demonstrate that existing mature landscaping and natural topographical variation are likely to partially obscure public views of the new maintenance road from the street and from various vantage points on the golf course.

As for traffic, the golf course is located on a busy four-lane road, which in 2020 had "average daily traffic" of 3,400 vehicles. Vehicles currently drive through the course. There is no indication that a significant number of additional maintenance trucks would be traversing the course, as "[a]n estimated two truck trips per week would remove accumulated screened solids from" the water treatment plant. At the time of the Declaration, there were 10 to 11 maintenance employees, and at most three additional employees would be hired once the plant is operational. The intermittent presence of these few additional vehicles does not support a fair argument that there will be a significant impact on aesthetics from the project.

c. *Nighttime Lighting*

Citizens argues that there is a fair argument that nighttime lighting at the facility will "have a significant impact" because "there is no similar existing development" in the area. However, the project site is in a developed

---

6 The trial court concluded "the planned landscape berm could itself cause a visual/aesthetic impact." However, the City-provided renderings show the berm as designed is not obtrusive or ugly. Neither the trial court nor Citizens points to any evidence to the contrary.

35

area near a highway and bike path, both of which are lit.  In fact, there is existing overhead lighting directly adjacent to proposed project site:



Existing View
View from Bike Path



Proposed Concept A
View from Bike Path



Proposed Concept B
View from Bike Path

Moreover, the Declaration reflects that "[o]utdoor lighting would be limited to low watt security lighting which would be downward cast to prevent any light trespass or excessive glare to prevent any significant impacts to nighttime views" and "would be partially blocked by the surrounding berm and the additional landscaping." The City represents that "[n]ighttime lighting . . . would be similar to existing nighttime lighting within golf course facilities and public parks" and would be insignificant "particularly when viewed from the closest residences, approximately 1,300 feet away."

Citizens's record citations do not contain substantial evidence to the contrary. Most of the public comments[7] simply allege a significant impact from nighttime lighting without any factual basis. (See, e.g., *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1042 ["[T]he testimony of a community member that 'we want to come home to peace and calm, not bright lights and noise' does not constitute substantial evidence showing the lighting may have a significant effect on the environment."].) These comments do not support a fair argument that a small amount of additional nighttime lighting will have a significant impact on the aesthetics of this area from the project.

---

[7] Other comments focus on the purported effect of nighttime lighting on local wildlife, even though the Declaration reflects that the proposed site, a municipal golf course in a developed area, "does not support any native habitat or listed species which could be adversely impacted by lighting." In any event, these are not aesthetic impacts, and lay opinion does not constitute substantial evidence of the effect of additional nighttime lighting on local fauna. (*Newtown*, *supra*, 65 Cal.App.5th at p. 789.)

III.

DISPOSITION

The judgment is reversed. The trial court is directed to enter a new judgment denying the petition for writ of mandate. The City is entitled to its costs on appeal.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.